# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Wells v. St. Bernard Hospital*, 2013 IL App (1st) 113512

---

| | |
|---|---|
| Appellate Court Caption | SALLIE WELLS, as Administrator of the Estate of Juanita Wells, deceased, Plaintiff-Appellant, v. ST. BERNARD HOSPITAL, SUNT WANA, M.D., EUGENE CHUKEDEBULU, M.D., ADEL ZAYYAD, M.D., MINETTE M. LUCRO, R.N., and CATHERINE MONCLAR, M.D., Defendants (Steinberg, Polacek and Goodman, Attorneys for Sallie Wells, Appellee). |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-3512 |
| Filed | March 29, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an appeal from the settlement of a wrongful death and survival action in which plaintiff's counsel was awarded enhanced fees pursuant to section 2-1114 of the Code of Civil Procedure, the denial of plaintiff's section 2-1401 petition to vacate the award of enhanced fees was upheld over plaintiff's contentions that an evidentiary hearing was not held and that the trial judge applied the wrong standard, since plaintiff waived an evidentiary hearing by failing to present any evidence at the hearing on the petition that would refute counsel's claim that extraordinary services were performed and enhanced fees were warranted, and further, the result would have been the same, even if the award were reviewed under an abuse of discretion standard, rather than the section 2-1401 standard. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-5863; the Hon. William D. Maddux, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Robert F. Harris, Public Guardian, of Chicago (Charles Perez Golbert, Kass A. Plain, and Mary Brigid Hayes, of counsel), guardian *ad litem*.

Bruce D. Goodman and Bradley D. Steinberg, both of Steinberg, Polacek & Goodman, of Chicago, for appellee.

Panel

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Hall and Reyes concurred in the judgment and opinion.

## OPINION

¶ 1    After plaintiff Sallie Wells' adult daughter, Juanita Wells (decedent), died at defendant St. Bernard Hospital, plaintiff retained counsel to file a wrongful death and survival action against St. Bernard and the health providers for their care and treatment of decedent, arguing that defendants' medical malpractice caused decedent's wrongful death. The case settled, and plaintiff's counsel petitioned the trial court for enhanced attorney fees pursuant to section 2-1114 of the Code of Civil Procedure (735 ILCS 5/2-1114 (West 2008)). The trial court granted counsel's petition and awarded plaintiff's counsel $56,850 in enhanced fees.

¶ 2    Four months after the trial court awarded the enhanced fees, Dr. Geoffrey Shaw, a board-certified psychiatrist, examined plaintiff and determined that she suffers from a "major psychiatric illness (most likely [s]chizophrenia)" and is developmentally disabled and thus was disabled at the time of the settlement and the petition for enhanced fees. The office of the public guardian (hereafter Public Guardian) was appointed as the temporary guardian of plaintiff, and the court declared her to be a disabled person. The Public Guardian filed a section 2-1401 petition to vacate the enhanced fee award, arguing that plaintiff lacked the capacity to consent to her counsel's petition for enhanced fees. 735 ILCS 5/2-1401 (West 2008). The trial court denied the petition, and this appeal followed. We affirm.

¶ 3                              BACKGROUND
¶ 4                    I. The Wrongful Death and Survival Action
¶ 5    Plaintiff Sallie Wells gave birth to two children: Michael Wells (Michael), born in 1968, and the decedent, Juanita Wells.[1] Both children were adults at all relevant times during the events of this case. Both children were taken from plaintiff at birth and placed into a foster care system. Michael was raised by Julia Mayes (Julia), his aunt and plaintiff's sister, and the decedent was raised by Estelle White, a family friend. Plaintiff receives only public aid and social security disability.

---

[1]Juanita Wells' age is not contained in the record in this case.

¶ 6        On May 29, 2006, the decedent was taken to St. Bernard Hospital by ambulance and hospitalized, complaining of chest pains. There was an issue as to whether the onset of her symptoms was caused by a suicide attempt. Decedent passed away two days later during her hospitalization. On July 10, 2006, plaintiff signed a retainer agreement with attorney James Gumbiner, to represent her in a medical malpractice claim against defendants for their negligent care and treatment of decedent during her hospitalization at St. Bernard. The agreement included a fee structure clause, whereby Gumbiner would receive "[t]hirty three and one-third (33/1/3) percent of the first $150,000 [recovered], twenty five (25%) percent of the next $850,000 of the sum recovered, twenty (20%) percent of any additional amount over $1,000,000 of the sum recovered." Furthermore, the agreement stated that "[t]he court may review contingent fee arrangements for fairness. In special circumstances, where an attorney performs extraordinary services involving more than usual participation in time and effort the attorney may apply to the court for approval of additional compensation." The agreement also included a provision which states that Gumbiner "may associate other attorneys with him in the prosecution of this case, if, in his judgment, it would be beneficial to the case to associate with other attorneys." The agreement further stated:

> "[I]n the event work is done on [the] case by such other attorneys, the other attorneys will be compensated either by direct payment by Mr. Gumbiner on an hourly basis or by receiving a percentage of the fee. In no event will [plaintiff] be required to pay any fees to such other attorneys directly, or in excess of the amounts referred to in this Agreement. There will be no extra charge for the services of such other attorneys; the other attorneys will be paid from the fee referred to above."

¶ 7        Gumbiner referred the case to the law firm of Steinberg, Polacek & Goodman, now known as Steinberg, Goodman & Kalish (SGK, the appellees in this appeal). The defendant health care providers are not parties to this appeal. In May 2008, prior to filing the complaint, SGK petitioned the probate division to appoint plaintiff as the administrator of decedent's estate, which was granted.[2]

¶ 8        On May 29, 2008, plaintiff filed the complaint for medical malpractice in the circuit court of Cook County. On February 19, 2009, after defendants subpoenaed decedent's prior medical records, plaintiff filed a motion for a protective order to prevent the receipt, disclosure, use, or dissemination of decedent's mental health records, pursuant to the Mental Health and Developmental Disabilities Confidentiality Act (Mental Health Act). 740 ILCS 110/1 *et seq.* (West 2008). The motion stated that decedent had received mental health care from numerous health care providers prior to her hospitalization on May 29, 2006. Plaintiff argued that decedent's mental health records were privileged, because the Mental Health Act prohibits the nonconsensual disclosure of mental health records except under certain circumstances. Plaintiff argued that no such circumstances existed in this case. On June 16, 2009, the trial court held a hearing on plaintiff's motion and granted the protective order after SGK reviewed all of the records and formulated objections to their use.

---

[2]Attorney Ronald Kalish testified during his discovery deposition that the omission of Michael from the petition as an heir was a "typographical error."

¶ 9       On March 4, 2010, plaintiff filed a petition to approve a settlement in the case in the trial court in exchange for a release of all claims for $825,000. Plaintiff received 96.37% and Michael received 3.63% of the net settlement.

¶ 10      The petition also included a request for enhanced attorney fees of $56,850, pursuant to section 2-1114(c) (735 ILCS 5/2-1114(c) (West 2008)). Under the medical malpractice statute, attorneys may recover fees of one-third of the first $150,000 of the award and one-fourth of the next $850,000. Section 2-1114 allows an attorney to recoup additional fees if "an attorney performs extraordinary services involving more than the usual participation in time and effort." 735 ILCS 5/2-1114(c) (West 2008). The petition stated that the special circumstances meriting enhanced fees include but are not limited to the following:

> "the difficulty in prosecuting the case, the nature of the defenses to the case, the difficulties in obtaining a favorable medical review as to the liability issues involved, creating the opportunity to settle the case at this time without further delay. In particular, this case involved unique issues of privilege under the Illinois Mental Health Act which were vigorously litigated and researched over a period of approximately one year. *** In connection with this issue, Plaintiff's counsel reviewed personally approximately twenty-five thousand pages of medical records from approximately thirty different admissions to various hospitals in the Chicagoland area. *** The effects of these extraordinary efforts by Plaintiff's counsel had a positive effect on the settlement value of the case."

The petition requested that attorneys Gumbiner and SGK, in exchange for their services, should receive fees of $275,000, or one-third of the total settlement amount. The petition stated that plaintiff had been made aware of the circumstances of the case and agreed that fees of $275,000 were fair in light of the special circumstances required by the case. After payment of fees, expenses, and the Illinois Department of Healthcare and Family Services public aid lien, plaintiff received $513,154.08 and plaintiff's son Michael received $29,947.50. Attached to the petition was a statement signed by plaintiff and Michael asserting they had read and approved the settlement petition, including the provision for enhanced fees. Also attached to the settlement petition was a list of enumerated expenses, totaling $3,898.42.

¶ 11      That same day, March 4, 2010, the trial court entered an order approving the settlement. The trial court found that the settlement amount was fair and reasonable, that the attorneys were entitled to enhanced fees of $56,850, which made a total fee of $275,000, and reimbursement of expenses of $3,898.42. The trial court approved apportionment of 96.37% to plaintiff and the balance of 3.63% of the settlement to Michael.

¶ 12                          II. Petition to Vacate Enhanced Fees

¶ 13      On May 12, 2010, plaintiff's sister and the aunt who raised Michael filed a petition in the probate division seeking that Michael be adjudged a disabled person. Dr. Frances Wong, a licensed physician, examined Michael and executed a written report finding that Michael is diagnosed with "mental retardation." Dr. Wong's report opined that Michael can perform "activities of daily living independently, but requires others to help him with critical thinking

decisions" and "needs supervision with financial decisions." The probate judge found Michael a disabled person and appointed his aunt as his guardian.

¶ 14    The probate judge also appointed an attorney to serve as guardian *ad litem* (GAL) for Michael's estate and ordered the GAL to review the settlement agreement. The GAL submitted a report opining that Michael was, both at the time of the settlement and at the present time, incapable of making financial decisions and thus incapable of agreeing to any enhanced fees.

¶ 15    On July 8, 2010, Dr. Geoffrey Shaw, a board-certified psychiatrist, examined plaintiff to determine her capacity to make her own personal and financial decisions. The examination resulted from a claim that plaintiff had been financially exploited following her receipt of money from the settlement. After receiving the settlement funds, plaintiff authorized three cashiers checks made payable to three separate people, Bruce Staggers, Jimmie Cook, and Martin Cosby, in the amounts of $10,000, $96,131, and $30,000, respectively. Plaintiff was unable to explain the reasons for gifting the cashiers checks to the payees. When asked about Staggers, Cook, and Cosby, she referred to them as "crooks." She was also unable to recall to Dr. Shaw the amount awarded to her in the settlement.

¶ 16    Dr. Shaw stated in his report that plaintiff has "a long history of Psychiatric Illness," was currently under the care of a psychiatrist, and that she was taking psychotropic medications. Plaintiff displayed prominent involuntary facial movements, known as tardive dyskinesia, which are indicative of the chronic administration of antipsychotic medications. Dr. Shaw opined that, "[u]pon questioning, it also became very apparent that [plaintiff] is also Developmentally Delayed." Dr. Shaw opined that plaintiff suffers from a "major psychiatric illness (most likely Schizophrenia) and is also Developmentally Delayed." Dr. Shaw further opined that although plaintiff "functions relatively well in her surroundings and appears to have a reasonably good quality of life," her judgment is impaired due to her developmental delay and "chronic" psychiatric illness. Dr. Shaw opined that plaintiff has an "extremely limited concept of finances," and that although she can, with support, reside alone, she requires assistance to ensure her basic needs, such as having adequate food and shelter, are met and requires access to ongoing medical and psychiatric care. Dr. Shaw opined that, "[i]n the area of financial decisions [plaintiff] is extremely vulnerable to exploitation." In sum, Dr. Shaw opined, beyond a reasonable degree of medical and psychiatric certainty, that plaintiff suffers from developmental delay and chronic psychiatric illness, and is "totally incapable of making her own financial decisions," but is "partially capable of making her own personal decisions."

¶ 17    Following Dr. Shaw's report, the office of the public guardian petitioned to be appointed as plaintiff's guardian to investigate the claim of financial exploitation and protect her assets. On August 18, 2010, the probate judge entered an order appointing the Public Guardian as plenary guardian of plaintiff's estate and limited guardian of plaintiff's person. In the order, the probate judge found that plaintiff is a disabled person, lacks some, but not all, understanding or capacity to make or communicate responsible decisions concerning the care of her person, and is "[t]otally unable to manage her estate or financial affairs."

¶ 18    On March 15, 2011, the Public Guardian filed a section 2-1401 petition in the case at bar

to vacate the enhanced attorney fees awarded to Gumbiner and SGK. 735 ILCS 5/2-1401 (West 2008). The trial judge, John Ward, had by this time retired, and the case was assigned to Judge William Maddux, the presiding judge of the law division.

¶ 19    The petition to vacate the enhanced fees stated the following: At the time plaintiff was presented with the petition to settle the case, she was receiving public aid and social security disability. After plaintiff approved the petition, she was examined by Dr. Shaw, who determined that she was incapable of making financial decisions. On information and belief, plaintiff's mental capacity as determined by Dr. Shaw in July of 2010 was the same as it was four months earlier on the date of the settlement. SGK had recommended to plaintiff that they establish a special needs trust for her. However, no special needs trust was ever established. The petition claimed that plaintiff had established her mental incapacity to SGK when plaintiff gave an answer to interrogatories regarding decedent's heirs, claiming that she was decedent's sole heir, when decedent had a brother.

¶ 20    The petition to vacate further alleges that the circumstances of the case were not extraordinary. Plaintiff's counsel settled the case 21 months after it was filed without a single deposition being taken, and only two dispositive motions were filed during the pendency of the suit. Plaintiff's counsel testified that he reviewed 25,000 pages of medical records, but they could not be produced because they had been destroyed. The Public Guardian asserted that plaintiff's meritorious claim to vacate the enhanced fee is that plaintiff and Michael were both mentally disabled and could not have consented to the enhanced fees, and that SGK was not entitled to any enhanced fees. The Public Guardian also asserted that it had exercised due diligence under the circumstances.

¶ 21    On June 14, 2011, SGK filed motions under sections 2-615 and 2-619 to dismiss the section 2-1401 petition to vacate the enhanced fee order. 735 ILCS 5/2-615, 2-619 (West 2008). The motions argued that the petition did not properly assert that plaintiff has a meritorious claim or exercised due diligence in discovering the claim, that the petition failed to satisfy the pleading requirements of section 2-1401, and that plaintiff improperly asked the trial court to relitigate the issue of enhanced fees based on events that occurred after the order granting the enhanced fees had been entered. In an affidavit attached to the motion, attorney Ronald Kalish of SGK stated that he personally reviewed 25,000 pages of decedent's medical records, which were kept in a locked conference room in Judge Ward's courtroom. Kalish indicated that after the trial court granted the settlement petition, the records were destroyed, due to the "privileged and sensitive nature of the records." Kalish stated that during the pendency of the case, plaintiff "actively participated in all aspects of the case, either by telephone or through personal visits to our office." Kalish stated that he visited plaintiff's home on "one or two occasions," and observed that she was "capable of reasonably maintaining her apartment and managing her personal affairs." Kalish stated that plaintiff expressed an understanding about the various aspects of the litigation process, including distribution of the proceeds, and that he did not observe anything about plaintiff that would "provide a basis to suggest that she was incompetent to make any decisions up to the time of distribution." Kalish stated that plaintiff specifically agreed to allow SGK to petition for enhanced attorney fees, and that she believed enhanced fees were fair and reasonable. Kalish stated that plaintiff had borrowed money from a company in the business

of loaning money to plaintiffs who have pending personal injury lawsuits, that plaintiff made the decision to borrow the money on her own, and that, when Kalish found out about the loan, plaintiff expressed to him an understanding of "the cost of the loan, the risk, and the obligation to pay it off at the conclusion of the case." Finally, Kalish stated that when plaintiff decided to settle the case, "she expressed an understanding of the consequences of receiving the settlement proceeds, and expressed a desire to go off public aid, not create a special needs trust, and not structure the settlement." Judge Maddux entered an order continuing the section 2-1401 petition *and* the motions to dismiss to October 19, 2011.

¶ 22    In the interim, the discovery deposition of attorney Ronald Kalish was taken on September 19, 2011, and was attached to plaintiff's response to SGK's motion to dismiss. Kalish testified that he joined the firm in 1997 and in three to four years became a partner. He is a litigator and SGK does primarily personal injury and medical malpractice litigation, and somewhere less than 50% of this work is in the medical malpractice arena. This case was referred to their office by attorney James Gumbiner. Prior to petitioning the probate division of the circuit court of Cook County, Kalish obtained and received decedent's medical records for the hospitalization in question, met and talked by phone with plaintiff and her son Michael on a number of occasions discussing the progress of the case, had discussions with the attorney representing St. Bernard Hospital, prepared the complaint and medical affidavit, had discussions with the medical consultant that signed the affidavit and another consultant who provided a negative opinion, had interoffice discussions with his partner Bruce Goodman, performed research on medical and related issues, and had numerous pretrials and settlement discussions with the attorneys for the defendants, as well as many settlement discussions with plaintiff and her son Michael. There were no time records kept, no depositions taken prior to settlement, and only a few motions before the court.

¶ 23    However, Kalish testified to spending hundreds of hours reviewing over 25,000 pages of decedent's prior medical records in the chambers of Judge John Ward. Defendants subpoenaed the records from various hospitals, including Northwestern, Mercy, Mt. Sinai, and Jackson Park. Kalish objected to the records as privileged under the Mental Health Act. Judge Ward had authorized an *in camera* procedure whereby Kalish was allowed to review all of decedent's prior mental health records on prior hospital stays in order for Kalish to determine whether these records would be objected to based on privilege under the Mental Health Act. Kalish sought a protective order against defendants so that they could not use the records against the decedent in the medical malpractice case that is the subject of the case at bar. After Kalish reviewed each page of the records, Kalish prepared a sampling of the contents of the records and prepared a brief for the trial court, and the judge ultimately ruled that all of the records were privileged. Kalish ultimately removed the many boxes of records from Judge Ward's chambers and destroyed them. In the process that lasted for four to six months, Kalish tabbed every page of the records, "sometimes multiple tabs," writing hand-written notes. Kalish testified that every page of the records was part of the process.

¶ 24    Kalish described the case at bar as a contested liability case where all of the issues in a medical malpractice case would be difficult to prove, which included (1) professional negligence in that there was a question of whether there was a deviation from the standard of care, (2) causation, and (3) damages. Damages were at issue because there was evidence

that the decedent attempted suicide, which was the reason she was hospitalized to begin with. That issue severely impacted damages in terms of the decedent's life expectancy. The breach of standard of care issue and causation issue were clouded because "there were multiple drugs that this patient was given on her admission that could cause an anaphylactic reaction"; therefore, there was a question of whether the benefit in giving the drugs outweighed the potential risks, side effects, or adverse reactions, and on the other hand, the drugs prescribed could have been suitable for decedent's condition of ill being and physiology. There were additional issues from the decedent's prior history of previous hospital admissions that impaired the history that was given on the hospitalization at issue as to whether her history for the admission was accurate. There were issues in terms of lack of family members who could provide a detailed accounting of the decedent's medical history. There were issues concerning decedent's relationship with her mother and brother.

¶ 25    The case required legal work from its inception up until it settled, which covered a span of over three years and five months and the settlement occurred over a "period of time." Kalish had many meetings with plaintiff in person, which he estimated as between 10 to 15 times, and numerous telephone calls. Plaintiff was kept advised as to everything important as it was happening. Kalish had many discussions with Michael also and personally met with him two to three times. Kalish opined that plaintiff always appeared to be competent and that he even traveled to plaintiff's residence and found it to be neat and orderly. He discussed a special needs trust with her so she could keep the funds she would receive while she was on public aid. Kalish contacted a structural settlement expert to talk with plaintiff. Kalish opined that plaintiff and Michael did not appear to be mentally handicapped and that both he and plaintiff agreed to the enhanced fees.

¶ 26    Kalish opined that the case was settled and the money disbursed under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2008)) because the Survival Act (755 ILCS 5/27-6 (West 2008)) damages would have been negligible. Kalish determined that the settlement was fair and reasonable and that there has never been any evidence that it was not. This was the first case that Kalish remembers he worked on where his firm requested enhanced fees. Kalish described his handling of the case claiming he had done an "extraordinary job."

¶ 27    The trial court held a hearing on the petition and motion to dismiss on October 19, 2011. The parties reiterated the arguments made in the petition and the motion, and Kalish restated parts of his deposition testimony, but neither side introduced new evidence. However, the record on appeal indicates that plaintiff had the opportunity to introduce new evidence. On October 25, 2011, the trial court entered a written order denying plaintiff's section 2-1401 petition. The trial court found that a section 2-1114 motion gives trial courts discretion to award enhanced fees under the statutory criteria. Using an abuse of discretion standard of review, the trial court determined that Judge Ward was not clearly wrong when he awarded the enhanced attorney fees, "even if the consents of Plaintiff and Michael are disregarded." The trial court found that Judge Ward was in a better position to evaluate whether or not SGK went to extraordinary measures to procure a beneficial settlement for plaintiff and found that it was required to give deference to Judge Ward's decision.

¶ 28                                    ANALYSIS

¶ 29        Plaintiff argues on appeal that the trial court erred in denying its section 2-1401 petition to vacate the enhanced attorney fees for three reasons: (1) Judge Maddux improperly failed to hold an evidentiary hearing on the section 2-1401 petition; (2) the petition should have been granted because plaintiff showed a meritorious claim and due diligence in discovering the meritorious claim and in filing the petition; and (3) Judge Maddux erred by reviewing the original grant of enhanced fees under section 2-1114 under an abuse of discretion standard of review, rather than determining whether the section 2-1401 petition successfully showed a meritorious claim and due diligence.

¶ 30                                I. Standard of Review

¶ 31        A reviewing court will not disturb a trial court's decision on a section 2-1401 petition absent an abuse of discretion. *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 221 (1986). An abuse of discretion occurs when no reasonable person would take the view adopted by the trial court. *Dowd v. Berndtson*, 2012 IL App (1st) 122376, ¶ 24.

¶ 32                              II. Evidentiary Hearing

¶ 33        Plaintiff argues that the trial court improperly ruled on the section 2-1401 petition without conducting an evidentiary hearing. SGK responds by arguing that plaintiff waived her right to an evidentiary hearing when she did not present additional evidence at the hearing held on October 19, 2011.

¶ 34        Plaintiff must prove the allegations of her section 2-1401 petitions by a preponderance of the evidence. *Smith*, 114 Ill. 2d at 223. When SGK challenges the facts alleged by plaintiff, a full and fair evidentiary hearing must be held. *Smith*, 114 Ill. 2d at 223. In *Smith*, the petitioner filed its section 2-1401 petition, alleging that the court should vacate a default judgment entered against the petitioner. *Smith*, 114 Ill. 2d at 216. The petitioner supported its allegations with affidavits attached to the petition. *Smith*, 114 Ill. 2d at 216. The respondent filed a response to the petition, challenging the petitioner's claims of due diligence. *Smith*, 114 Ill. 2d at 218. The response was supported by counteraffidavits. *Smith*, 114 Ill. 2d at 218. The petitioner then submitted two supplemental affidavits. *Smith*, 114 Ill. 2d at 220. The trial court held a hearing on the petition, at which "no other evidence was introduced; only arguments were heard." *Smith*, 114 Ill. 2d at 220. "The matter was taken under advisement, and the circuit court subsequently entered an order denying the petition to vacate the default judgment" finding that the petition failed to meet the due diligence requirement. *Smith*, 114 Ill. 2d at 220. Based on the petitioner's failure to present new evidence at the hearing on the petition, our Illinois Supreme Court found that the petitioner "waived its right to an evidentiary hearing involving the testimony of witnesses and the opportunity to cross-examine," and that "on the basis of the pleadings, affidavits, and supporting materials in evidence, [our Illinois Supreme Court could not] say that the circuit court erred" in denying the petition. *Smith*, 114 Ill. 2d at 223.

¶ 35        Similarly, in the case at bar, the trial court entered an order on July 25, 2011, continuing plaintiff's section 2-1401 petition *and* SGK's motion to dismiss to October 19, 2011.

Between the entry of that order and the hearing date, plaintiff obtained the discovery deposition of attorney Kalish. On the date of the hearing, the parties made arguments concerning their positions. Plaintiff argued that SGK's services in the case did not rise to the level of extraordinary, and SGK reiterated the points Kalish made in his deposition, notably that Kalish reviewed 25,000 pages of medical records over a period of several months and that Judge Ward had personal knowledge of the extensive work Kalish put in to the case. However, neither party called witnesses to testify or submitted new documentary evidence. At the conclusion of the hearing, Judge Maddux said the following: "We've talked about everything we can on this. I'm going to take this under advisement and I'm going to look at a couple more things and will let you know in a few days."

¶ 36 Like in *Smith*, plaintiff failed to present evidence at the hearing on her petition. *Smith*, 114 Ill. 2d at 220. Although plaintiff had taken Kalish's deposition a month prior to the hearing, and thus had been made aware of SGK's reasoning regarding why they believed the enhanced fees were merited, plaintiff failed to present new evidence rebutting or disproving Kalish's statements. Therefore, we cannot say that the trial court abused its discretion when it denied plaintiff's petition despite plaintiff not presenting evidence at a hearing. *Smith*, 114 Ill. 2d at 223; *Blutcher v. EHS Trinity Hospital*, 321 Ill. App. 3d 131, 141 (2001) (stating that "when a party to a section 2-1401 petition participates in a hearing based solely on the pleadings, affidavits, and arguments of counsel without requesting an evidentiary hearing," the petitioner waives the right to an evidentiary hearing (internal quotation marks omitted)).

¶ 37                                    III. Content of Petition

¶ 38 To succeed on a section 2-1401 petition, petitioners must "set forth allegations supporting the existence of a meritorious claim or defense; due diligence in presenting the claim or defense to the circuit court in the original action; and due diligence in filing the section 2-1401 petition." *Paul v. Gerald Adelman & Associates, Ltd.*, 223 Ill. 2d 85, 94 (2006). " 'The quantum of proof necessary to sustain a section 2-1401 petition is a preponderance of the evidence.' " *Paul*, 223 Ill. 2d at 95 (quoting *Smith*, 114 Ill. 2d at 221).

¶ 39                                    A. Meritorious Claim or Defense

¶ 40 Plaintiff argues that the petition presented the meritorious claim that "a competent administrator would have recognized that no extraordinary services were performed and would have challenged the enhanced fee under 735 ILCS 5/2-1114." The case of *Clay v. County of Cook* lists two sets of criteria courts may use in determining whether attorneys performed extraordinary services, and thus are entitled to enhanced fees under section 2-1114. *Clay v. County of Cook*, 325 Ill. App. 3d 893, 902 (2001). First, the Illinois Rules of Professional Conduct state the following:

"The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent." Ill. S. Ct. R. Prof. Conduct R. 1.5(a) (eff. Jan. 1, 2010).

See *Clay*, 325 Ill. App. 3d at 902 (stating that the above criteria "may be utilized in evaluating fee awards under the provisions of section 2-1114"). Illinois courts have also used a similar set of factors to determine the reasonableness of attorney fees including: " 'the skill and standing of the attorneys employed, the nature of the case, the novelty and difficulty of the issues involved, the degree of responsibility required, the usual and customary charge for the same or similar services in the community, and whether there is a reasonable connection between the fees charged and the litigation.' " *Clay*, 325 Ill. App. 3d at 902 (quoting *Chicago Title & Trust Co. v. Chicago Title & Trust Co.*, 248 Ill. App. 3d 1065, 1072 (1993)).

¶ 41 Plaintiff argues that the facts of the case do not indicate that SGK adequately satisfied these criteria. Specifically, she argues that SGK did not keep records detailing the time and labor its attorneys expended while handling the case, neither side took depositions during the pendency of the case, defendants did not file affirmative defenses, and the case settled before going to trial. Plaintiff argues that the case "settled in routine fashion" and did not involve a novel or difficult issue.

¶ 42 Plaintiff attached the following to its petition: (1) plaintiff's petition for letters of administration of decedent's estate; (2) the court order declaring plaintiff an heir of decedent's estate; (3) the complaint at law; (4) the release and settlement agreements; (5) the petition to settle the action; (6) Judge Ward's order granting settlement; (7) Julia Mayes' petition to be appointed Michael's guardian; (8) the letters of office appointing Julia as plenary guardian of Michael's person and estate; (9) the probate court's order appointing Michael a guardian *ad litem*; (10) the guardian *ad litem*'s initial report concerning Michael; (11) Dr. Shaw's medical evaluation of plaintiff; (12) Dr. Shaw's written report admitted in the probate division; (13) the order appointing a guardian for plaintiff as a disabled person; (14) the agreed order appointing a plenary guardian of the estate and limited guardian of the person of plaintiff; and (15) the probate division's order allowing the Public Guardian to contract with outside counsel in plaintiff's case. None of these attachments addressed the factors enumerated in *Clay*. Plaintiff did not attach any affidavits to its response to SGK's motion to dismiss the petition, nor was there any expert testimony or other evidence to show that SGK was not entitled to an enhanced fee. Plaintiff did attach Kalish's deposition and a supplemental report by Dr. Shaw, in which he opined that plaintiff's developmental delay had been present since birth.

¶ 43     By contrast, SGK attached an affidavit by attorney Kalish to its motion to dismiss the petition, in which he described reviewing the 25,000 pages of medical records, and in making notes on every page to support his objections through the use of the privileged material. Furthermore, in his discovery deposition, which was attached to the pleadings, Kalish testified to the many ways in which the services SGK provided to plaintiff were extraordinary. Kalish testified that the nature of the issues in the case made proving deviation from the standard of care, causation, and damages very difficult. Damages were at issue because there was evidence that the decedent attempted suicide, which was the reason she was hospitalized to begin with. That issue severely impacted damages in terms of the decedent's life expectancy. The breach of standard of care issue and causation issue were clouded because "there were multiple drugs that this patient was given on her admission that all could cause an anaphylactic reaction"; therefore, there was a question of whether the benefit in giving the drugs outweighed the potential risks, side effects, or adverse reactions, and on the other hand, the drugs prescribed could have been suitable for decedent's condition of ill being and physiology. There were additional issues from the decedent's prior history of previous hospital admissions that impaired the history that was given on the hospitalization at issue as to whether her history for the admission was accurate. There were issues in terms of lack of family members who could provide a detailed accounting of the decedent's medical history. There were issues concerning decedent's relationship with her mother and brother.

¶ 44     Kalish testified that he spoke with plaintiff frequently about the progress of the case. He also testified to spending months and hundreds of hours reviewing 25,000 pages of medical records for the purpose of preparing a privilege log. The privileged medical records were related to decedent's mental state and history of suicide attempts, which defendants could use at trial and would have had a negative impact on the damages plaintiff could recover. As a result of Kalish's efforts, the trial court ordered the medical records privileged, and without that finding, the value of the case would have been substantially diminished. When the case settled, plaintiff received a significant damage award. Kalish further testified that, because he performed an *in camera* review of the medical records, in Judge Ward's conference room and chambers, Judge Ward was personally aware of the amount of time he spent reviewing the records. At the hearing on the petition, plaintiff did not present any evidence to disprove Kalish's affidavit or deposition testimony.

¶ 45     Although plaintiff provided evidence regarding her inability to consent, she provided no evidence refuting that SGK performed extraordinary services. A party's inability to give consent is not one of the enumerated factors courts use in determining whether or not an attorney performed the extraordinary services necessary to receive enhanced fees. *Clay*, 325 Ill. App. 3d at 902; Ill. S. Ct. R. Prof. Conduct R. 1.5(a) (eff. Jan. 1, 2010); *Chicago Title & Trust*, 248 Ill. App. 3d at 1072. Since the only evidence plaintiff presented was immaterial to the trial court's determination that SGK was entitled to an enhanced fee, plaintiff did not show a meritorious claim. As a result, we cannot say that Judge Maddux abused his discretion in denying plaintiff's petition.

¶ 46                    B. Due Diligence

¶ 47    "If the petitioner fails to allege the existence of a meritorious [claim or] defense, the petition is properly denied, and due diligence need not be addressed." *Rockford Financial Systems, Inc. v. Borgetti*, 403 Ill. App. 3d 321, 327 (2010). Since we cannot say that the trial court abused its discretion with regard to plaintiff's failure to prove the existence of a meritorious claim, we need not address whether she was diligent in discovering the claim and filing her petition.

¶ 48            C. Trial Court's Review of the Petition

¶ 49    Plaintiff argues that Judge Maddux improperly reviewed the section 2-1401 petition, treating it like a review of Judge Ward's grant of enhanced fees under section 2-1114 rather than as a section 2-1401 petition. In Judge Maddux's order, he cited to *Clay* and *Madalinski v. St. Alexius Medical Center*, 369 Ill. App. 3d 547 (2006), which states that trial courts have discretion in granting enhanced attorney fees under section 2-1114 and that reviewing courts use the abuse of discretion standard of review when evaluating disputes about fees pursuant to section 2-1114. Judge Maddux concluded that Judge Ward's order was "not clearly wrong" and that he must "give deference to Judge Ward's decision, as he was in a better position to truly determine whether SGK went to extraordinary measures in procuring [p]laintiff a beneficial settlement." Judge Maddux did not state whether or not he found that plaintiff presented a meritorious claim and satisfied the due diligence requirements. Plaintiff argues that since Judge Maddux failed to mention the meritorious claim and due diligence requirements of a section 2-1401 petition, his ruling was in error. We may affirm on any basis that we find in the record, even if our reasoning is different from that of the trial court. *People v. Carrera*, 394 Ill. App. 3d 368, 373 (2009).

¶ 50    We do not find this argument persuasive. In his written order, Judge Maddux relied on *Clay*, which is pertinent to the assessment of enhanced fees. The *Clay* case provides two sets of factors trial courts may use to determine whether or not to grant enhanced fees pursuant to section 2-1114. *Clay*, 325 Ill. App. 3d at 902. In determining whether plaintiff presented a meritorious claim that SGK was not entitled to enhanced fees, Judge Maddux had to examine the facts of SGK's representation of plaintiff and the law concerning when enhanced fees are merited. Judge Maddux had before him plaintiff's section 2-1401 petition, SGK's motion to dismiss the petition, Kalish's affidavit attached to the motion, plaintiff's response to SGK's motion, and Kalish's discovery deposition. Judge Maddux also presided over the hearing at which plaintiff and SGK argued the points made in their various filings. Utilizing the evidence before him in the record and the enhanced fee factors articulated in *Clay*, Judge Maddux could analyze plaintiff's arguments in light of the evidence concerning whether or not SGK provided extraordinary services. Judge Maddux came to the conclusion that Judge Ward's decision to grant enhanced fees was "not clearly wrong." In effect, Judge Maddux found that plaintiff did not present any evidence that SGK was not entitled to the enhanced fee, and found that the record supported SGK's grant for the enhanced fees.

¶ 51    Based on the evidence in the record, our conclusion would not change even if we were to review Judge Ward's award of fees under an abuse of discretion standard, instead of

plaintiff's petition under section 2-1401. Plaintiff presented no evidence related to any of the factors enumerated in the *Clay* case. *Clay*, 325 Ill. App. 3d at 902. SGK, on the other hand, submitted evidence relevant to the " 'time and labor required, the novelty and difficulty of the questions involved,' " " 'the amount involved and the results obtained,' " and " 'the nature and length of the professional relationship with the client.' " *Clay*, 325 Ill. App. 3d at 902 (quoting Ill. S. Ct. R. Prof. Conduct R. 1.5(a) (eff. Jan. 1, 2010)). SGK's evidence was also relevant to " 'whether there is a reasonable connection between the fees charged and the litigation.' " *Clay*, 325 Ill. App. 3d at 902 (quoting *Chicago Title & Trust*, 248 Ill. App. 3d at 1072). All of this evidence is relevant to determining whether SGK engaged in extraordinary services on behalf of plaintiff, and, by extension, whether plaintiff's claim that SGK was not entitled to enhanced fees was meritorious. We find that plaintiff's claim was not meritorious because plaintiff failed to present sufficient evidence to show that SGK was not entitled to enhanced fees.

¶ 52                                          CONCLUSION

¶ 53        For the above reasons, we cannot find that the trial court abused its discretion when it denied plaintiff's section 2-1401 petition. Plaintiff was given a hearing at which she could have presented witnesses, and she failed to do so. Plaintiff did not present any evidence relevant to the factors courts examine when deciding whether attorneys are entitled to enhanced fees, and thus could not show by a preponderance of the evidence that SGK was not entitled to enhanced fees.

¶ 54        Affirmed.